UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x

THE EVERGREEN ASSOCIATION, INC.
d/b/a/ EXPECTANT MOTHER CARE and
EMC FRONTLINE PREGNANCY
CENTERS,

                   Plaintiff,

         - against -

CITY OF NEW YORK,

                   Defendant.

-------------------------------------------------------x

**MEMORANDUM & ORDER**

20-CV-0580 (PKC) (PK)

PAMELA K. CHEN, United States District Judge:

Plaintiff The Evergreen Association, Inc. ("Plaintiff" or "Evergreen") brings this action against Defendant City of New York ("Defendant" or "the City"), seeking: (1) a declaratory judgment that Local Law No. 20 of 2019 ("Local Law 20") is unconstitutional; (2) an injunction prohibiting the City from enforcing Local Law 20; and (3) attorneys' fees and costs. The parties have filed cross-motions for summary judgment, which are now ripe for adjudication. For the reasons explained below, the City's motion for summary judgment is granted, and Evergreen's motion for summary judgment is denied. This case is dismissed for lack of standing and ripeness pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(1).

# BACKGROUND

## I.    Factual Background[1]

### A.    Evergreen and Its Employment Practices

Evergreen[2] is a nonprofit organization headquartered in Yonkers, New York.  (Slattery Decl.[3] ¶ 3.)  Evergreen, which was founded in 1985, operates throughout the New York City metropolitan area, including Brooklyn, The Bronx, and Queens.  (*Id.* ¶¶ 2–3; *see also* Dep. Tr. of James Harden, Dkt. 63-2 ("Harden Dep."), at 44:3–10, 45:12–16, 99:9–13 (explaining that Evergreen used to have fourteen locations, but now has only three).)  Christopher T. Slattery

---

[1] Unless otherwise noted, a standalone citation to a party's Local Rule 56.1 statement denotes that the Court has deemed the underlying factual allegation undisputed.  Any citation to a party's Local Rule 56.1 statement incorporates by reference the documents cited therein.  Where relevant, the Court may cite directly to an underlying document.  However, where either party (i) admits or (ii) denies without citing to admissible evidence certain of the facts alleged in the other's 56.1 statement, the Court may deem any such facts undisputed.  *See* Local Rules of the United States District Courts for the Southern and Eastern Districts of New York 56.1(c)–(d); *Lumbermens Mut. Cas. Co. v. Dinow*, No. 06-CV-3881 (TCP), 2012 WL 4498827, at *2 n.2 (E.D.N.Y. Sept. 28, 2012) ("Eastern District Local Rule 56.1 requires . . . that disputed facts be *specifically* controverted by admissible evidence.  Mere denial of an opposing party's statement or denial by general reference to an exhibit or affidavit does not specifically controvert anything." (emphasis in original)); *Risco v. McHugh*, 868 F. Supp. 2d 75, 86 n.2 (S.D.N.Y. 2012).  In addition, the Court will not consider "factual assertions" contained in the 56.1 Statements "that are otherwise unsupported in the record," *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) (citation omitted), or "legal conclusions contained in the various [56.1] statements[,]" *Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 52 (2d Cir. 2012) (citation omitted).

[2] Evergreen also does business as "Expectant Mother Care" and "EMC FrontLine Pregnancy Centers."  (Decl. of Christopher T. Slattery, Dkt. 40-1 ("Slattery Decl."), ¶ 1.)

[3] The declarations of Christopher T. Slattery (Dkt. 40-1) and James Harden (Dkt. 64-1) both contain several "conclusory allegations in affidavit form," which the Court disregards in determining whether there exist genuine issues of disputed fact for trial.  *United Mag. Co. v. Murdoch Mags. Distrib., Inc.*, 393 F. Supp. 2d 199, 211 (S.D.N.Y. 2005), *aff'd sub nom. United Mag. Co. v. Curtis Circulation Co.*, 279 F. App'x 14 (2d Cir. 2008) (summary order); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) ("The object of [Rule 56] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."); *Hayes v. N.Y.C. Dep't of Corrs.*, 84 F.3d 614, 619 (2d Cir. 1996) ("[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial.").

("Slattery") was Evergreen's founder and president until his death in November 2023. (Slattery Decl. ¶ 1; Decl. of James Harden, Dkt. 64-1 ("Harden Decl."), ¶ 4.)[4] Around the time of Slattery's death, Reverend James Harden ("Rev. Harden") took over as Evergreen's president. (Harden Decl. ¶¶ 2, 4.) Evergreen espouses an anti-abortion ideology, operating "crisis pregnancy centers" that provide "counseling, education, and nursing care" to pregnant women. (Slattery Decl. ¶¶ 6–8.)

Evergreen typically employs between five to seven individuals on a part-time basis. (Slattery Decl. ¶ 4; Harden Dep. 53:15–22, 98:19–25.) Evergreen has no human resources department; instead, Slattery "was the H.R." and managed Evergreen's employees until his death. (Harden Dep. 20:20–25.) Now, Rev. Harden[5] manages Evergreen's staff, which largely consists of nurses and ultrasonographers who "provide[] pregnancy diagnosis by ultrasound imaging" and "[p]rovide counseling to women who are . . . pregnant and considering abortion." (*Id*. at 22:4–23:22.) Evergreen staff also includes one counselor who is neither a nurse nor an ultrasonographer.[6] (*Id*. at 62:19–24, 65:2–13.)

When hiring staff, Evergreen's primary consideration is whether the candidates oppose abortion, such that they would not refer the pregnant women Evergreen works with for abortions.

_____

[4] Until his death, Slattery was also a Plaintiff in this lawsuit. (*See* Compl., Dkt. 1; Am. Compl., Dkt. 58 (removing Slattery as Plaintiff following his death).)

[5] Rev. Harden is also the Chief Executive Officer of another organization, CompassCare. (Harden Dep. 16:13–20.) The two organizations at times work in tandem, including with Rev. Harden relying on CompassCare's human resources personnel for assistance. (*Id*. at 21:4–10.) The two organizations, however, remain separate entities. (*Id*. at 18:5–9.)

[6] To the extent that the parties dispute whether all employees participate in promoting Evergreen's message, (*see* Def.'s Resp. to Pl.'s Supp. R. 56.1 Statement, Dkt. 65-1, ¶¶ 9–10), the Court draws all inferences in favor of Plaintiff and thus assumes for the purposes of this motion that all employees act as Evergreen's "messengers," (*id.*); *see Jingrong v. Chinese Anti-Cult World All. Inc.*, 16 F.4th 47, 56 (2d Cir. 2021) (explaining that courts should "draw all reasonable inferences against the party whose motion is under consideration" (quoting *Byrne v. Rutledge*, 623 F.3d 46, 53 (2d Cir. 2010))).

For example, when hiring nurses, Evergreen seeks licensed candidates who have "a pro-life position," and would not provide "abortion referrals." (*Id.* at 24:12–20.) According to Rev. Harden, in terms of hiring qualifications for nurses, "that's basically it." (*Id.* at 24:21.) When hiring counselors, Evergreen seeks individuals who are "passionately pro-life," who "love[] people," and who are "willing and able to work with people who don't speak English very well." (*Id.* at 49:16–50:2.) In Evergreen's job announcements,[7] it states that it is "looking for pro-life people." (*Id.* at 25:6–11; *see also* Job Announcement, Dkt. 64-3, at ECF 2, 4 ("Pro-life commitment is a must.").) Evergreen then "corroborate[s]" any candidate's anti-abortion beliefs through the interview process. (Harden Dep. 25:6–11.) During the interview, an Evergreen representative[8] asks the prospective employee about "the nature of . . . their pro-life convictions." (*Id.* at 26:14–22.) As part of this process, Evergreen asks questions such as "have you had any experience with abortion?" and "are you pro-life?" (*Id.* at 27:2–6.) That said, Evergreen often hires candidates who have had abortions, (*id.* at 92:10–14), so long as they have gone through "the appropriate kind of healing process," such that they would be "able to interface with [] other women facing that same decision-making process," (*id.* at 28:8–15; *see also id.* at 28:16–22 (Harden testifying that Evergreen wants to ensure that any prospective employees who had obtained abortions had "dealt with it emotionally" before being hired by Evergreen); *id.* at 122:23– 25 (Harden testifying that Evergreen doesn't "expect to hire people that haven't had abortions"); *but see id.* at 30:9–12 (Harden testifying that Evergreen would not hire someone who had

---

[7] Rev. Harden testified that Evergreen is not currently hiring and does not currently have plans to hire in the future. (Harden Dep. 65:21–66:10, 98:20–25.)

[8] Typically, Slattery was the person responsible for employment-related decisions at Evergreen, and so historically he handled these interviews. (Pls.' Resp. to Def.'s R. 56.1 Statement., Dkt. 35 ("Pls.' 56.1 Resp."), ¶ 14; Harden Dep. 86:20–87:3.)

"participated in abortion . . . in some form or fashion, and would do it again")).  Evergreen also hires candidates who have used birth control in the past.  (*Id.* at 92:15–19.)  During the hiring process, Evergreen verbally informs candidates about its code of conduct, which is not a written document, but "relate[s] to . . . a Biblical ethic of sexuality," including "abstinence for non-married people [and] rejection of abortion[.]"  (*Id.* at 70:20–71:18.)

Since Rev. Harden became President of Evergreen (in or around November 2024), all employees are required to sign a "Staff Statement of Position, Faith & Principle" (the "Statement of Principle").  (*Id.* at 72:20–74:20; *see also* Statement of Principle, Dkt. 64-5; Harden Decl. ¶ 4.) The Statement of Principle details Evergreen's anti-abortion and anti-birth control stance. (Statement of Principle, Dkt. 64-5, at ECF[9] 1–2.)  By signing the Statement of Principle, Evergreen staff agree, among other things, not to "refer or provide patients with birth control," not to "refer or advise any woman to have an abortion," to "commit to a monogamous marriage" if they are married, and to "remain sexually abstinent" if they are unmarried.  (*Id.* at ECF 2–3.)  Staff also agree to "uphold" Evergreen's position, mission, and values as stated in the Statement of Principle. (*Id.* at ECF 4.)  The Statement of Principle also permits staff to list their "questions, concerns, or differences," regarding the various statements.  (*See generally id.*)  Evergreen does not take any actions to ensure that its staff comply with the Statement of Principle; instead, it uses an "honor system."  (Harden Dep. 83:17–22.)  According to Rev. Harden, an employee's compliance with Evergreen's anti-abortion and anti-birth control position "never has" "come up" as an issue.  (*Id.* at 96:15–22.)  In its 40-year history, Evergreen has never terminated or disciplined any employee for their reproductive or sexual health decisions, including using birth control or having an

---

[9] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

abortion.  (Pl.'s 56.1 Resp. ¶ 23; *see also* Harden Dep. 42:5–17, 60:23–61:6, 80:24–81:25, 84:4–11.)[10]

In the past, Evergreen has also enlisted the services of volunteers and interns.  (Slattery Decl. ¶ 5.)  In the wake of Slattery's death, however, Evergreen discontinued its internship program with no plans to restart it.  (Harden Dep. 66:6–18, 68:17–24, 114:3–7.)  Evergreen continues to maintain an unspecified number of volunteers that perform tasks on an *ad hoc* basis.  (*Id.* at 103:2–104:9.)

### B.    Local Law 20

Local Law 20 was first introduced in the New York City Council (the "City Council") on April 25, 2018, as Introduction 863.  (Pl.'s 56.1 Resp. ¶ 29.)  The City Council Committee on Civil and Human Rights held a hearing[11] on the bill in November 2018, (*id.* ¶ 30), after which, the bill was amended, (*id.* ¶ 34).  In December 2018, the City Council Committee on Civil and Human Rights approved the proposed legislation, (*id.* ¶ 35), as did the full City Council, (*id.* ¶ 36).  Then-Mayor Bill DeBlasio took no action on the bill, and by operation of law, the proposed bill, now titled "Local Law 20 of 2019," went into effect on May 20, 2019.  (*Id.* ¶ 37.)

Local Law 20 amended Title 8 of the New York City Administrative Code ("Administrative Code") to prohibit employment discrimination and discriminatory harassment or

---

[10] In addition to its part-time staff who provide in-person services, Evergreen hires contractors to conduct digital marketing so that individuals can learn about Evergreen's services. (Harden Dep. 99:14–23.)  This marketing is outsourced to another company, which was not identified by name in the record before this Court.  (*Id.* at 100:25–101:7.)  Moreover, there is no information before the Court regarding the hiring or employment practices relating to this company.

[11] Neither Slattery nor Evergreen testified, nor sought to testify or otherwise submit a public comment, on Introduction 863.  (Pl.'s 56.1 Resp. ¶ 33.)  Likewise, neither Slattery nor Evergreen engaged in public comment on the regulations that were proposed under Local Law 20.  (*Id.* ¶ 56.)

violence based on an individual's "sexual and reproductive health decisions[.]"[12] (Local Law 20, Dkt. 42-5.)  The law defines "sexual and reproductive health decisions" as "any decision by an individual to receive services . . . relating to sexual and reproductive health, including the reproductive system and its functions."[13] (*Id.* at ECF 2.)  These "services" are further defined as "includ[ing]," but "not limited to, fertility-related medical procedures, sexually transmitted disease prevention, testing, and treatment, and family planning services and counseling, such as birth control drugs and supplies, emergency contraception, sterilization procedures, pregnancy testing, and abortion." (*Id.*)  The relevant portions of Local Law 20—that is, those barring employment-related discrimination based on sexual and reproductive health decisions—are codified in the City's Administrative Code at § 8-101 *et seq*. (Pl.'s 56.1 Resp. ¶¶ 39, 42); *see also* N.Y.C. Admin. Code §§ 8-101, 8-102, 8-107, 8-602.  Specifically, the New York City Administrative Code § 8-107 provides, in relevant part:

§ 8-107 Unlawful discriminatory practices.

1. Employment. It shall be an unlawful discriminatory practice:

  (a) For an employer or an employee or agent thereof, because of the actual or perceived . . . sexual and reproductive health decisions . . . of any person:

---

[12] Local Law 20's prohibition on employment discrimination also prohibits employers from stating in their job announcements that they limit their applicant pool based on "sexual and reproductive health decisions." *See* N.Y.C. Admin. Code § 8-107(1)(d), (2)(d).

[13] The Court interprets "sexual" to modify the words "health decisions" and not merely "decisions." (*See* Local Law 20, Dkt. 42-5, at ECF 1.)  Local Law 20, then, protects individuals from employment discrimination based on their "sexual health decisions," not based on their "sexual decisions" or sexuality.  This comports with the definition of "sexual and reproductive health decisions" in Local Law 20 as set forth above. (*Id*. at ECF 2.)  That said, other portions of the Administrative Code do protect individuals from employment discrimination based on their sexual orientation, partnership status, and marital status.  *See* N.Y.C. Admin. Code § 8-101. Evergreen does not challenge those portions of the Administrative Code in this suit. (*See* Am. Compl., Dkt. 58.)

(1) To represent that any employment or position is not available when in fact it is available;

(2) To refuse to hire or employ or to bar or to discharge from employment such person; or

(3) To discriminate against such person in compensation or in terms, conditions or privileges of employment.

N.Y.C. Admin. Code § 8-107.  Local Law 20 generally applies to employees, interns, and independent contractors of all employers in New York City with four or more persons in their employ, though it provides an exemption for "religious institutions."  (Pl.'s 56.1 Resp. ¶ 47); *see also* N.Y.C. Admin. Code §§ 8-102, 8-107(2), 8-107(12).  The parties dispute whether Local Law 20 applies to volunteers.  (Def.'s Resp. to Pl.'s R. 56.1 Statement, Dkt. 43 ("Def.'s 56.1 Resp."), ¶ 5.)

Persons "aggrieved by an unlawful discriminatory practice" under Local Law 20 can file a complaint with the City's Human Rights Commission ("Commission") for adjudication pursuant to procedures set forth in the statute.  N.Y.C. Admin. Code §§ 8-109 through 8-120;  *see also id.* § 8-102.  The Commission also has the authority to initiate its own actions under the statute.  *Id.* § 8-109(c).  Remedies that can be imposed by the Commission include, but are not limited to, *inter alia*: civil penalties of up to $250,000; hiring, reinstatement, or upgrading of employees; back pay; front pay; compensatory damages; and attorney's fees and costs.  *Id.* §§ 8-120, 8-126.  In addition, a private right of action is available under the law.  *Id.* § 8-502(a).

Around the same time that the City adopted Local Law 20, the New York state legislature enacted a similar law colloquially known as the "Boss Bill."  (Harden Dep. at 74:5–11); N.Y. Lab. Law § 203-e.  Among other things, the Boss Bill prohibits employers from discriminating against any employee "on the basis of the employee's or [their] dependent's reproductive health decision

making, including, but not limited to, a decision to use or access a particular drug, device or medical service[.]"[14]  N.Y. Lab. Law § 203-e(2)(a).

### C.    Local Law 20's Impact on Evergreen

The parties agree that Evergreen is not a "religious institution" as defined by the Administrative Code, and therefore is potentially subject to Local Law 20.  (Pl.'s 56.1 Resp. ¶ 50.) Evergreen has not changed its practices or policies because of Local Law 20.  (Slattery Decl. ¶ 39 (explaining that Evergreen has "continue[d] to operate in a manner consistent with [its] mission and beliefs" since the passage of Local Law 20)[15]; Pl.'s 56.1 Resp. ¶ 24 (Slattery and Evergreen admitting that they "have not changed, and do not intend to change, their employment practices as a result of Local Law 20").)  Evergreen has not incurred any financial or economic injuries because of Local Law 20, nor has it been subject to any employment discrimination lawsuits or other enforcement actions related to Local Law 20 since its enactment.  (Pl.'s 56.1 Resp. ¶¶ 26, 28.)

## II.    Procedural History

### A.    Initial Proceedings

Evergreen[16] filed its initial Complaint on January 31, 2020, alleging violations of the Free Speech Clause of the First Amendment, the Free Exercise of Religion Clause of the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, and Plaintiff's right to

---

[14] The Boss Bill is somewhat broader than Local Law 20.  For example, the Boss Bill specifically prohibits employers from "requir[ing] an employee to sign a waiver or other document which purports to deny an employee the right to make their own reproductive health care decisions, including use of a particular drug, device, or medical service."  N.Y. Lab. Law § 203-e(2)(b).

[15] This paragraph also states that "complying with Local Law No. 20 of 2019 would compel [Evergreen] to violate [its] core principles[.]"  (Slattery Decl. ¶ 39.)  This is a legal conclusion couched as a fact, which the Court disregards.  (*See* n.1, n.3 *supra*.)

[16] Because Slattery is no longer a plaintiff in this matter, the Court refers only to "Plaintiff" or "Evergreen."

expressive association under the First Amendment.  (Compl., Dkt. 1, ¶¶ 71–126.)  On June 23, 2020, the City filed a request for a pre-motion conference in anticipation of filing a motion to dismiss pursuant to Rule 12(b)(6).  (Dkt. 11.)  On June 30, 2020, Plaintiff responded.  (Dkt. 12.)  This Court held a pre-motion conference on August 6, 2020.  (8/6/2020 Min. Entry.)  After the pre-motion conference, the City declined to file its proposed motion to dismiss, (*see* Dkt. 14), and answered the Complaint, (Answer, Dkt. 15).  The parties proceeded to discovery.  (Dkts. 16–21.)  On May 21, 2021, the City filed a pre-motion conference request for an anticipated motion for summary judgment.  (Dkt. 22.)  The same day, Evergreen filed its own pre-motion conference request for its anticipated motion for summary judgment.  (Dkt. 23.)  The Court denied both requests as unnecessary and the parties briefed the cross-motions for summary judgment. (5/25/2021 Dkt. Order; Dkts. 26–46.)

### B.      Parallel Northern District of New York Action Regarding the Boss Bill

On September 30, 2022, this Court issued an Order explaining that "Plaintiff[] failed to notify the Court" of its action challenging the constitutionality of the Boss Bill, which it had filed in the Northern District of New York the same day it filed this action.  (Dkt. 47); *see also Slattery v. Cuomo*, 531 F. Supp. 3d 547 (N.D.N.Y. 2021), *aff'd in part, rev'd in part & remanded sub nom. Slattery v. Hochul*, 61 F.4th 278 (2d Cir. 2023) (hereinafter "the NDNY Action").  As the Court explained in its Order, the NDNY Action is "plainly relevant" to this case because of the similarities between the two laws and because Plaintiff was challenging the Boss Bill largely on the same constitutional grounds.  (Dkt. 47); *see also Cuomo*, 531 F. Supp. 3d at 547.  By the time the parties briefed their summary judgment motions in this case, the Honorable Thomas J. McAvoy, then presiding over the NDNY Action, had dismissed the case pursuant to Rule 12(b)(6) based on the State's motion.  *Cuomo*, 531 F. Supp. 3d at 547.  Plaintiff appealed Judge McAvoy's dismissal order to the Second Circuit, and that appeal was pending at the time briefing was

completed on the summary judgment motions here.  (Dkt. 47); Not. of Appeal, *Evergreen Ass'n v. Hochul*, No. 20-CV-0112 (AMN) (DJS), at Dkt. 35.   However, neither party notified the Court about the pending appeal until the City mentioned it in its opposition to Plaintiff's summary judgment motion, which was filed on September 27, 2021.  (Dkt. 47; Dkt. 41 at 5.)   On September 30, 2022, the Court stayed this case pending the Second Circuit's decision in the NDNY Action.  (Dkt. 47.)   In doing so, the Court terminated the motions for summary judgment with leave to renew within 28 days of the Circuit's mandate in the NDNY Action.  (*Id.*)

The Second Circuit issued its decision in the NDNY Action on February 27, 2023. (4/11/2023 Dkt. Order); *Hochul*, 61 F.4th at 278.  Assuming without deciding that Evergreen had standing,[17] the Second Circuit affirmed the dismissal of Plaintiff's free speech, free exercise of religion, and vagueness claims,[18] but reversed the dismissal of its expressive association claim, and remanded for further proceedings.  *See Hochul*, 61 F.4th at 295.  In affirming Judge McAvoy's dismissal of Plaintiff's free speech claim, the panel explained, "[w]hile we recognize that Evergreen's freedom to make personnel decisions affects its ability to advocate its views and

---

[17] The Second Circuit's decision in *Slattery v. Hochul* does not explicitly address standing, despite plaintiff-appellants Slattery and Evergreen having argued in their reply brief that they had standing.  *See generally Hochul*, 61 F.4th at 278; *see also* Reply Br. of Plaintiff-Appellants, *Slattery v. Hochul*, No. 21-0911, 2021 WL 4052672, at *6–9 (2d. Cir. Sept. 1, 2021), at Dkt. 81. However, the Circuit's presumption of standing in that case does not dictate the outcome here given the difference in procedural posture between the two actions.  *See Cerame v. Slack*, 123 F.4th 72, 88 n.16 (2d Cir. 2024) ("[T]he proof required to establish standing increases as the suit proceeds[.]" (quoting *Davis v. Fed. Elec. Comm'n*, 554 U.S. 724, 734 (2008))).  Relatedly, whereas Judge McAvoy ruled on a motion to dismiss based on the allegations in the complaint, here, the Court rules on competing motions for summary judgment based on an evidentiary record developed through discovery.

[18] Though Count IV of the complaint in the NDNY Action is entitled "Violation of the Equal Protection Clause . . . ," the text below it raises a vagueness challenge, not an Equal Protection Clause claim.  *See* Compl., *Evergreen Ass'n v. Hochul*, No. 20-CV-0112 (AMN) (DJS), at Dkt. 1.  Thus, Evergreen did not raise an Equal Protection challenge in the NDNY Action.  *See also Hochul*, 61 F.4th at 284 (addressing vagueness challenge).

thereby implicates its freedom of expressive association, . . . we are not persuaded that the state's attempt to regulate those personnel decisions is itself a regulation of speech." *Id.* at 292. In affirming the dismissal of Plaintiff's free exercise claim, the panel found that the Boss Bill "is religion-neutral and generally applicable." *Id.* And the panel found that the statute's terms were not unconstitutionally vague. *Id.* at 295. On the expressive association claim, however, the Circuit held that Evergreen had sufficiently alleged that it was "engaged in expressive association" and that, at the motion to dismiss stage, the State had not demonstrated that the Boss Bill's provisions were the "least restrictive means to achieve a compelling government interest." *Id.* at 286. Thus, the Circuit reversed dismissal of that claim, which proceeded to discovery.[19]

Notably, on January 31, 2025, the Honorable Anne M. Nardacci, now presiding over the NDNY Action, granted the State's motion for summary judgment on standing grounds, and dismissed the case for lack of subject matter jurisdiction. *See Evergreen Ass'n, Inc. v. Hochul*, No. 20-CV-0112 (AMN) (DJS), 2025 WL 359074, at *7 (N.D.N.Y. Jan. 31, 2025). The Court cites to the relevant holdings of that decision herein.

## C. Amendment of the Complaint and Supplemental Discovery

This Court lifted the stay in this case on April 24, 2023, and, at the Court's direction, the parties filed supplemental briefing on the impact of the Second Circuit's decision in the NDNY Action on this case. (4/24/2023 Dkt. Order; Dkts. 50–51.)

On November 15, 2023, Plaintiff filed a letter explaining that "the individual plaintiff in this case, Christopher T. Slattery, because of poor health, has resigned as president of The

---

[19] The Second Circuit recently further clarified that "[f]or an employer to make the showing required by *Slattery* [*v. Hochul* to prevail on an expressive association claim], it must show that the [law in question] threatens [the plaintiff-organization's] very mission not only in a vague and generalized sense, but in the context of a specific employment decision." *CompassCare v. Hochul*, 125 F.4th 49, 61 (2d Cir. 2025).

Evergreen Association, Inc.," and was replaced by Rev. Harden, who "plan[ned] to carry on business as usual at Evergreen[.]" (Dkt. 52.)  Plaintiff further indicated that it intended to "dismiss Mr. Slattery's individual claims (either by motion or stipulation) and proceed with Evergreen as the sole plaintiff." (*Id.*)  On December 8, 2023, Plaintiff notified the Court that Slattery had passed away on November 22, 2023, (Dkt. 53), and requested leave to file an amended complaint "removing Slattery as a plaintiff, alleging that Harden is the new president of Evergreen, and making a few other changes," while leaving the legal theories at the heart of the case unchanged. (Mot. for Leave to Amend, Dkt. 54, at 2.)  The City opposed Plaintiff's motion to amend with respect to "the addition of factual allegations unrelated to Evergreen's change in leadership." (Def.'s Resp. to Mot. to Amend, Dkt. 57, at 1.)  The Court granted Evergreen's motion to amend to the extent that it sought "to remove Mr. Slattery and add allegations that indicate Rev. Harden is now Evergreen's president and will continue the same employment practices," but denied Evergreen's motion to "add new allegations about the law at issue and Evergreen's operations and practices," which "were or should have been known to Plaintiff when the Complaint was originally filed or shortly thereafter." (2/22/2024 Dkt. Order.)  Evergreen filed its Amended Complaint on March 1, 2024, (Am. Compl., Dkt. 58), which is the operative complaint.

The parties then jointly requested the opportunity to conduct limited supplemental discovery in light of Slattery's death, and to file supplemental Rule 56.1 statements, as well as supplemental briefing. (Joint Status Ltr., Dkt. 60, at ECF 2–3.)  The Court granted this request and adopted the parties' proposed schedule for the City to file its answer to the Amended Complaint, and for the parties to conduct supplemental discovery and briefing. (4/8/2024 Dkt. Order.)  The City filed its Answer to the Amended Complaint on April 12, 2024. (Answer, Dkt. 62.)  The parties filed supplemental briefs and Rule 56.1 Statements on May 10, 2024, and

supplemental responses on May 24, 2024. (*See* Dkts. 63–66.)   The parties' cross-summary judgment motions are now ripe for decision.

## LEGAL STANDARD

Summary judgment is appropriate where the submissions of the parties, taken together, "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (explaining that the summary judgment inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").  In determining whether a genuine issue of fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino*, 542 F.3d 290, 309 (2d Cir. 2008).  The Court also construes any disputed facts in the light most favorable to the nonmoving party.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157–59 (1970).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson*, 477 U.S. at 247–48 (emphasis in original).

A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.  The initial burden of "establishing the absence of any genuine issue of material fact" rests with the moving party.  *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010).  Once this burden is met, however, the burden shifts to the nonmoving party to put forward some evidence establishing the existence of a question of fact that must be resolved at trial.  *Spinelli v. City of New York*, 579 F.3d 160, 166–67 (2d Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  A mere "scintilla

of evidence" in support of the nonmoving party is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (citation omitted) (alteration in original). In other words, "[t]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (citation omitted); *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010) (explaining that a plaintiff must "show more than 'some metaphysical doubt as to the material facts'" to survive summary judgment (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986))).

With respect to cross-motions for summary judgment, courts "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Jingrong*, 16 F.4th at 56 (quoting *Byrne*, 623 F.3d at 53). Moreover, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

## DISCUSSION

### I.    The City's Motion to Strike[20]

As explained above, after Slattery passed away, the parties requested that the Court re-open discovery, explaining that a deposition of Rev. Harden taken in the NDNY Action "should become part of the record in the instant matter so that it may be used to supplement the Rule 56.1

---

[20] "Because a decision on the motion to strike may affect [the movant's] ability to prevail on summary judgment, it is appropriate to consider a motion to strike prior to a motion for summary judgment." *Vista Food Exch., Inc. v. Comercial De Alimentos Sanchez S de R L de C.V.*, 627 F. Supp. 3d 408, 415 (S.D.N.Y. 2022) (quoting *Pugliese v. Verizon N.Y., Inc.*, No. 05-CV-4005 (KMK), 2008 WL 2882092, at *5 (S.D.N.Y. July 9, 2008)).

Statements and supplementary briefing[,]" and also requesting to conduct limited additional discovery so that the Court might "have the benefit of current documents, information, and the deposition of [Rev. Harden,] Plaintiff's current president." (Joint Status Ltr., Dkt. 60, at ECF 2–3.) The Court granted the parties' request, and the parties filed the supplemental materials. (4/8/2024 Dkt. Order; Dkts. 63–66.)

Among the evidentiary materials attached to Evergreen's supplemental Rule 56.1 Statement were several email chains between Slattery and various internship candidates dating to 2014, 2018, and 2019. (*See* 5/18/2019 Email, Dkt. 64-4; 12/21/2014, 8/29/2018, & 6/18/2019 Email Chains, Dkt. 64-6.) In one email, an internship candidate responds to a candidate questionnaire seemingly sent by Slattery. (5/18/2019 Email, Dkt. 64-4.) In the other three email exchanges, Slattery rejects internship candidates (1) for not being "pro-abstinence," (Dkt. 64-6 at ECF 1), (2) for "acceptance of artificial birth control," (*id.* at ECF 3), and (3) for being "pro-abortion," (*id.* at ECF 4). Though attached to Evergreen's Supplemental Rule 56.1 Statement, they were not provided to the City during the initial period of discovery, which ended on May 7, 2021, and only surfaced sometime after Plaintiff filed its Amended Complaint in March 2024. (Def.'s Second Supp. Br., Dkt. 65, at 2; 3/15/2021 Dkt. Order.)

The City argues that Evergreen has "improperly proffer[ed]" these emails and that they should be struck from the record because they "were in the possession of Plaintiff during the original discovery period, were not produced at that time, and do not relate to the change in leadership at Evergreen." (Def.'s Second Supp. Br., Dkt. 65, at 2.) The Court agrees.

Rule 26(a) requires parties to provide, among other things, "a copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims

16

or defenses, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A)(ii). Rule 37(c) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or . . . evidence on a motion . . . , unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "The purpose of [Rule 37(c)(1)] is to prevent the practice of 'sandbagging' an opposing party with new evidence." *Haas v. Del. & Hudson Ry. Co.*, 282 F. App'x 84, 86 (2d Cir. 2008) (summary order) (quoting *Ebewo v. Martinez*, 309 F. Supp. 2d 600, 607 (S.D.N.Y. 2004)). "In determining whether evidence should be excluded pursuant to Rule 37, courts consider the following factors: '(1) the party's explanation for the failure to comply with the disclosure requirement; (2) the importance of . . . the precluded [evidence]; (3) the prejudice suffered by the opposing party as a result of having to prepare to [respond to the new evidence]; and (4) the possibility of a continuance.'" *Vista Food Exch., Inc.*, 627 F. Supp. 3d at 416 (quoting *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 296 (2d Cir. 2006)). A finding of bad faith is not required for a court to exclude evidence pursuant to Rule 37. *Design Strategy, Inc.*, 469 F.3d at 296.

In failing to produce the relevant emails prior to filing them as evidence supporting its Supplemental Rule 56.1 Statement, Evergreen plainly failed to comply with its obligations under Rule 26(a). The Court reopened discovery in this case so that the parties might provide the Court with "current documents, information, and the deposition of [Rev. Harden,] Plaintiff's current president." (Joint Status Ltr., Dkt. 60, at ECF 3.) It did *not* reopen discovery so that the parties could supplement their evidentiary materials with documents that they had in their possession since the inception of the case and should have produced during the initial discovery period and that do not relate to the change in leadership at Evergreen. (*See id.*; *see also* 4/8/2024 Dkt. Order.)

17

Turning to the factors courts typically consider in these circumstances, Evergreen has not provided any reason for not previously disclosing the emails at issue. (*See generally* Pl.'s Supp. 56.1 Statement, Dkt. 64; Pl.'s Second Supp. Br., Dkt. 66.) Moreover, the Court finds that the City would be highly prejudiced by admission of this evidence since the City is unable to question Slattery, who participated in these email exchanges and made the relevant hiring decisions, (*see* Harden Dep 86:14–87:6), about those decisions and the conversations that precipitated them. Furthermore, Rev. Harden does not believe that Slattery kept any notes or other records of those conversations, apart from the emails. (*Id.* at 88:23–89:5.)

In addition, because these emails were not previously disclosed, the City was unable to depose the intern candidates about their conversations with Slattery that led to these emails being sent—that is, the conversations that led to their respective rejections from the Evergreen internship program. (*See* 12/21/2014, 8/29/2018, & 6/18/2019 Email Chains, Dkt. 64-6.) While a continuance could theoretically be granted to permit the City to depose the intern candidates (but not Slattery), the Court does not believe that a continuance is appropriate, given that this litigation has already been pending for over four years and given the absence of any explanation for Evergreen's failure to produce the emails years earlier. Plus, Slattery's views on hiring are no longer particularly relevant, given that he is no longer president of Evergreen. Rev. Harden, who now runs the organization, testified at his deposition that he was "not privy to [the] conversation[s]" that precipitated the emails in question, and thus does not have additional insight to offer into those decisions. (Harden Dep. 87:18–22, 88:14–22, 89:6–90:4.) Finally, the emails themselves are inadmissible hearsay as to why the intern candidates were rejected, and should not be considered in deciding whether to grant a summary judgment motion. *See Selvam v. Experian Info. Sols., Inc.*, 651 F. App'x 29, 31–32 (2d Cir. 2016) (summary order) (explaining that a "party

opposing summary judgment 'cannot rely on inadmissible hearsay in opposing a motion for summary judgment[ ] absent a showing that admissible evidence will be available at trial'" (alteration in original) (emphasis omitted) (quoting *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985))).[21]

For all of these reasons, the Court exercises it discretion to exclude the emails between Slattery and the internship applicants from the record.  *See Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 101 (2d Cir. 2002) ("[W]here . . . the nature of the alleged breach of a discovery obligation is the non-production of evidence, a District Court has broad discretion in fashioning an appropriate sanction[.]").  Therefore, the Court will not consider Evergreen's email evidence submitted at Docket Nos. 64-4 and 64-6.

## II.    Evergreen Lacks Standing to Bring this Action

### A.    Legal Standard

"Article III of the Constitution grants the federal courts the power to decide legal questions only in the presence of an actual 'Case' or 'Controversy.'"  *Wittman v. Personhuballah*, 578 U.S. 539, 543 (2016) (quoting U.S. Const. art. III, § 2, cl. 1) (cleaned up).  The party invoking federal court jurisdiction is tasked with demonstrating standing.  *Id.*  Thus, to obtain judicial review, a plaintiff must demonstrate that they are not "a mere bystander, but instead [that they] have a 'personal stake' in the dispute."  *Food & Drug Admin. v. All. For Hippocratic Med.*, 602 U.S. 367,

---

[21] In addition, the potential relevance of these emails is diminished by the fact that they fail to show that Evergreen did not hire the prospective interns based on sexual or reproductive health *decisions* they had made.  Slattery rejected the first candidate, John James Peoples, because Peoples did not hold "pro-abstinence" beliefs.  (12/21/2014, 8/29/2018, & 6/18/2019 Email Chains, Dkt. 64-6, at ECF 1.)  The second candidate, Milani Worschell, was similarly rejected because of her "acceptance of" people using "artificial birth control," not specifically because of her own use of it.  (*Id.* at ECF 3.)  And the third candidate, Sylvita Andrea, was seemingly rejected as well because of her "pro-abortion" views.  (*Id.* at ECF 4.)

379 (2024) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)). "Article III standing is a 'bedrock constitutional requirement that [the Supreme] Court has applied to all manner of important disputes.'" *Id.* at 378 (quoting *United States v. Texas*, 599 U.S. 670, 675 (2023)). Put another way, the standing doctrine helps ensure that federal courts do not "operate as an open forum for citizens 'to press general complaints about the way in which government goes about its business.'" *Id.* (quoting *Allen v. Wright*, 468 U.S. 737, 760 (1984)).

The plaintiff "bears the burden of establishing standing as of the time [they] brought this lawsuit and maintaining it thereafter." *Carney v. Adams*, 592 U.S. 53, 59 (2020) (citations omitted). To do so, "a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014) (alteration in original) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). As litigation progresses, plaintiffs "must support each element of standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Defs. of Wildlife*, 504 U.S. at 561); *see also Cerame*, 123 F.4th at 88 n.16 ("[T]he proof required to establish standing increases as the suit proceeds[.]" (quoting *Davis*, 554 U.S. at 734)). Consequently, "inferences appropriate when considering [a] motion to dismiss may be inappropriate when weighing [standing on] a motion for summary judgment." *Cerame*, 123 F.4th at 88 n.16. Indeed, "[i]n response to a summary judgment motion . . . the plaintiff can no longer rest on such mere allegations, but must set forth . . . specific facts" that could give rise to standing. *Do No Harm v. Pfizer, Inc.*, -- F.4th --, No. 23-15, 2025 WL 63404, at *6 (2d Cir. Jan. 10, 2025) (per curiam) (quoting *Defs. of Wildlife*, 504 U.S. at 561).

For the purposes of a pre-enforcement challenge, "a plaintiff has suffered an injury-in-fact and has standing to bring a case when [it] is facing the 'threatened enforcement of [the relevant] law' that is 'sufficiently imminent.'" *Picard v. Magliano*, 42 F.4th 89, 97 (2d Cir. 2022) (quoting *Susan B. Anthony List*, 573 U.S. at 158–59). Thus, to satisfy the injury-in-fact requirement before the law is enforced against it, a plaintiff must show that it has "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder."[22] *Id.* (quoting *Susan B. Anthony List*, 573 U.S. at 159). "'The identification of a credible threat sufficient to satisfy the imminence requirement of injury in fact necessarily depends on the particular circumstances at issue,' and will not be found where 'plaintiffs do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible.'" *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016) (quoting *Knife Rights, Inc. v. Vance*, 802 F.3d 377, 384 (2d Cir. 2015)). Although imminence "is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." *Defs. of Wildlife*, 504 U.S. at 564 n.2 (citations omitted) (emphasis in original). The Supreme Court has "repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citations omitted) (emphasis in original); *see also id.* at 410 ("[A] highly attenuated chain of possibilities[] does not satisfy the requirement that threatened injury must be certainly impending.");

---

[22] Although some of the cases the Court discusses regarding pre-enforcement standing concern criminal statutes, "it d[oes] not matter [whether] the law at issue impose[s] only civil, and not criminal, liability." *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 690 (2d Cir. 2013). "The fear of civil penalties can be as inhibiting of speech as can trepidation in the face of threatened criminal prosecution." *Vt. Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 382 (2d Cir. 2000).

*TransUnion*, 594 U.S. at 435 (explaining that future risk of harm must be "sufficiently imminent and substantial"). However, "[a]n allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List*, 573 U.S. at 158 (citation omitted). Pre-enforcement First Amendment claims are subject to "somewhat relaxed standing and ripeness rules." *Nat'l Org. for Marriage, Inc.*, 714 F.3d at 689. But still, to prevail on a pre-enforcement First Amendment challenge, "[a] plaintiff must allege something more than an abstract, subjective fear that [its] rights are chilled in order to establish a case or controversy." *Id.* "In other words, 'a plaintiff has standing to make a pre[-]enforcement challenge when fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative.'" *Evergreen Ass'n*, 2025 WL 359074, at *3 (quoting *Hedges v. Obama*, 724 F.3d 170, 196 (2d Cir. 2013)).

## B.    Application

Evergreen brings a pre-enforcement challenge against Local Law 20. However, the undisputed facts fail to demonstrate that enforcement of Local Law 20 against Evergreen is "sufficiently imminent," *Picard*, 42 F.4th at 97, let alone "certainly impending," *Defs. of Wildlife*, 504 U.S. at 564 n.2 (emphasis omitted).[23] First, the evidence shows that it is unlikely that an

---

[23] In its submissions, Evergreen exaggerates the reach of Local Law 20. As discussed, Local Law 20 prohibits employment discrimination based on an individual's "sexual and reproductive health decisions," *i.e.*, which are defined as "any decision by an individual to receive services . . . relating to sexual and reproductive health, including the reproductive system and its functions." (Local Law 20, Dkt. 42-5.) Contrary to Evergreen's assertions, the law *does not* prohibit Evergreen from making employment decisions based on an individual's beliefs or attitudes, including being pro-choice or pro-birth control and even expressing those views. (*Compare id.*, *with* Slattery Decl. ¶ 31 (erroneously claiming that Local Law 20 "prevents [Evergreen] from considering and acting on an employee's or other staffer's decision to support or publicly advocate for abortion rights or the use of abortifacient drugs")). Similarly, Local Law 20 does not prohibit Evergreen from requiring their employees not to engage in certain sexual activities as a condition of their employment—e.g., sex outside of marriage. (*Compare* Slattery Decl. ¶¶ 33–34 (conclusorily asserting that Local Law 20 "den[ies] Evergreen] the right

Evergreen employee will make a sexual or reproductive health decision that contravenes Evergreen's values.[24]   The evidence overwhelmingly demonstrates that Evergreen carefully screens and selects its employees to ensure that their beliefs surrounding abortion and birth control comport with Evergreen's.  (*See* Background Section I.A. *supra* (describing Evergreen's thorough hiring process in detail).)  And, as Rev. Harden testified, because Evergreen seeks out candidates whose positions on abortion and birth control align with its own, it has never, in its 40-year history, had occasion to "fire[] anybody for making an abortion decision or a contraceptive decision." (Harden Dep. 84:4–11; Pl.'s 56.1 Resp. ¶ 23 (admitting that "[n]o employee, intern, or volunteer of Evergreen has ever been fired or disciplined for having an abortion, using contraceptives, or otherwise failing to adhere to Evergreen's definition of 'sexual morality'"); *see also* Harden Dep. 24:12–21, 49:16–50:9 (explaining that Evergreen's primary hiring consideration is whether the candidate has "a pro-life position," such that they would not provide "abortion referrals").) Second, even if an Evergreen employee did make such a decision, the evidence fails to show a likelihood that Evergreen would discipline them for it, notwithstanding Slattery's claim that Evergreen "intend[s] to take employment action against employees who . . . procure abortions," (Slattery Decl. ¶ 40); *see Picard*, 42 F.4th at 97 (explaining that plaintiffs must show, *inter alia*, "an intention to engage in a course of conduct arguably affected with a constitutional interest").

---

to . . . circulate written materials in accordance with [its] beliefs . . . that sexual abstinence outside of marriage is a grave moral duty"), *with* Local Law 20, Dkt. 42-5 (containing no provision prohibiting employers from taking action to ensure that employees do not engage in sexual conduct disapproved of by the employer).)

[24] The Court notes that to the extent the disputed emails between Slattery and prospective interns are relevant, they only reinforce the conclusion that Evergreen rigorously screens even its interns to ensure that they believe in Evergreen's "pro-life" values, thereby substantially lessening the chance that an employee or intern would make a sexual or reproductive health decision that would be contrary to those principles.

As Rev. Harden testified, Evergreen "hire[s] people all the time that have had abortions in their past" and "probably" also hires people who have used birth control in the past. (Harden Dep. 92:10–21.) Evergreen also explains in its opposition that a woman who has "had an abortion" might "become a committed, compelling advocate for [Evergreen's] message[,]" and that an issue would arise only if an employee made "an unrepentant decision to have . . . an abortion[, which] reveal[ed] an unbridgeable gap between [the] employee or potential employee and [Evergreen]'s goal of bringing about an abortion-free culture." (Pl.'s Summ. J. Opp'n, Dkt. 34, at 1–2.); *see also Evergreen Ass'n*, 2025 WL 359074, at *4 ("The evidence demonstrates that Evergreen's employment decisions are based on beliefs, not reproductive health decisions[.]"). And Evergreen "ha[s] not changed, and do[es] not intend to change, their employment practices as a result of Local Law 20." (Pl.'s 56.1 Resp. ¶ 24; Slattery Decl. ¶ 39 (explaining that Evergreen has "continue[d] to operate in a manner consistent with [its] mission and beliefs").) Thus, although Slattery stated that Evergreen "intend[s] to take employment action against employees who . . . procure abortions," (Slattery Decl. ¶ 40), the organization's 40-year history, coupled with Rev. Harden's testimony, demonstrate otherwise.[25]

---

[25] True, Evergreen now requires its employees to agree to "uphold" the "Positional Statements" contained in its Statement of Principle. (*See* Statement of Principle, Dkt. 64-5, at ECF 1.) But that document does not preclude Evergreen's employees from receiving sexual or reproductive health services, which is what Local Law 20 protects. (*See id*. at ECF 2–3.) Instead, the Statement of Principle requires staff to agree not to "refer or provide patients with birth control," and not to "refer or advise any woman to have an abortion." (*Id*.) The Statement of Principle is thus geared toward ensuring that Evergreen employees effectively communicate the organization's message; it does not preclude employees from receiving sexual and reproductive health services, nor does it state that employees could or would face discipline for having abortions or using birth control. (*See id*.); *see also Evergreen Ass'n*, 2025 WL 359074, at *5 (holding that the Statement of Principle "fails to provide the necessary concrete support for Evergreen's intent to violate the statute, and instead, further establishes Evergreen's intent to act on employees' beliefs, not their decisions"). As such, this evidence is consistent with Evergreen's historical practice of carefully screening, and only employing, individuals who subscribe to, and are willing

For much the same reasons, Evergreen has not demonstrated that it would refuse to hire any prospective employees because of sexual or reproductive health decisions that the applicant has made.  Even acknowledging the possibility that Evergreen might reject a job applicant for having an abortion, Evergreen has never done so in its 40-year history and Evergreen's own statements make clear that its hiring decisions are based on the applicant's repentance (or lack thereof) after having had an abortion, not on the decision to obtain reproductive health services itself.  In other words, for Evergreen, the key consideration in whether to hire someone is the applicant's thoughts or beliefs about their own past sexual or reproductive health decisions, not the decision itself.  As Judge Nardacci explained, "[i]f an applicant who has had an abortion but has become a pro-life advocate has been, and can still be, hired, the decision not to hire a similar applicant who did not become a pro-life advocate after having an abortion is based on that applicant's beliefs, not the applicant's reproductive health decisions."  *See Evergreen Ass'n*, 2025 WL 359074, at *5.  Thus, Plaintiff's own explanation of its hiring criteria "merely bolsters the notion that it has lawfully rejected and will reject applicants due to their beliefs but does nothing to affirm its stated intent to violate the statute."  *Id.*[26]

---

to promote, Evergreen's "pro-life" values—which, in turn, has resulted in no instances of Evergreen employees being disciplined for making sexual or reproductive health choices antithetical to those values.

[26] While Local Law 20 theoretically might preclude Plaintiff from "stating, declaring or publishing a preference (such as in a job application) based on sexual or reproductive health decisions," (Pl.'s First Supp. Br., Dkt. 51, at 5), Plaintiff has never done so in its 40-year history, and its admission that an applicant's past reproductive health care decision in itself would not preclude employment with Evergreen shows that Plaintiff is unlikely to ever do so.  (*See* Pl.'s Summ. J. Opp'n, Dkt. 34, at 1–2 (explaining that a woman who has "had an abortion" might "become a committed, compelling advocate for [Evergreen's] message"); *see also* Job Announcement, Dkt. 64-3, at ECF 2, 4 (requiring applicants to have a "pro-life commitment," but not discussing any requirements relating to sexual or reproductive health decisions).)

Finally, the Court notes that the foregoing discussion assumes that Evergreen actually learns of an employee's sexual or reproductive health decision, which in itself is unlikely. Such information is typically private and confidential. *See* 45 C.F.R. § 164.512(b)(1)(v) (prohibiting healthcare providers from disclosing protected health information except as permitted or required by law); *see also id.* § 164.502 (setting forth the limited circumstances under which healthcare providers may share an individual's protected health information with their employer without that individual's express written consent); *but see* U.S. Dep't of Health & Hum. Servs., "Employers and Health Information in the Workplace," https://www.hhs.gov/hipaa/for-individuals/employers-health-information-workplace/index.html ("Your employer can ask you for a doctor's note or other health information if they need the information for sick leave, workers' compensation, wellness programs, or health insurance.") (last visited Feb. 1, 2025). Indeed, Rev. Harden admits that Evergreen has virtually no way of learning whether its employees are complying with Evergreen's positions in their personal lives.[27] (*See* Harden Dep. 96:15–21 (testifying that Evergreen does not ask employees after hiring about whether they've had an abortion or used birth control in the past); *see also id.* at 83:17–22 (testifying that after employees are hired, Evergreen relies on the "honor system").)[28] Although Evergreen contends that it might learn about an employee's sexual or

---

[27] Notably, Evergreen's Statement of Principle does not require employees to self-report if they receive any sexual or reproductive healthcare. (*See* Statement of Principle, Dkt. 64-5.)

[28] The Court understands that Evergreen can find out about an *applicant* having had an abortion or receiving other sexual or reproductive health services in the past simply by asking them, (Harden Dep. 27:2–7), but Evergreen does not point to a single instance where such a reproductive health care decision has resulted in the refusal to hire someone. Indeed, as discussed *supra* at 24–25, an applicant's past decision to have an abortion does not preclude them from being hired. (*See id.* at 92:10–21 (testifying that Evergreen "hire[s] people all the time that have had abortions in their past" and "probably" also hires people who have used birth control in the past.); *see also Evergreen Ass'n*, 2025 WL 359074, at *4 ("The evidence demonstrates that Evergreen's employment decisions are based on beliefs, not reproductive health decisions[.]").

reproductive health decision by observing their employees' appearances, through social media, or through "water cooler" talk with co-workers, (Pl.'s Summ. J. Opp'n, Dkt. 34, at 14–15), the Court agrees with Judge Nardacci that the absence of any evidence "that these scenarios have occurred in the past [shows that it is] unlikely that these scenarios will occur in the future and that Evergreen would ever have the knowledge necessary to violate the statute by taking action against employees." *Evergreen Ass'n*, 2025 WL 359074, at *5. Thus, even assuming that Plaintiff does "intend to take employment action against employees who . . . procure abortions," (Slattery Decl. ¶ 40), it cannot demonstrate that it is likely to learn of such an action by an employee.

While the Court recognizes that a plaintiff challenging the constitutionality of a statute in a pre-enforcement setting need not place itself at risk of being sued to have standing, *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007), nor show that prosecution is certain or has been threatened, *see, e.g.*, *New Hope Fam. Servs. v. Poole*, 966 F.3d 145 (2d Cir. 2020) (adoption ministry told by state officials that it had to comply with the challenged state law or cease to operate), here, the undisputed facts show that there is almost no chance that Plaintiff will face an enforcement action under Local Law 20 because the individuals they hire strongly believe in and, for 40 years have abided by, the organization's values, and because Plaintiff does not police its employees' healthcare decisions or require them to self-report regarding those decisions, *see Evergreen Ass'n*, 2025 WL 359074, at *6 (finding that "the hypothetical chain of events that would need to occur to create the conditions for Evergreen to engage in conduct proscribed by the statute is fatally attenuated"). While it is understandable that Plaintiff might want assurance that it will not be sued for disciplining an employee for having an abortion, that desire for clarity does not provide standing where there is no "substantial risk" that this will occur. *See Susan B. Anthony List*, 573 U.S. at 158 ("An allegation of future injury may suffice if the threatened injury is certainly

27

impending, or there is a substantial risk that the harm will occur." (citation omitted)); *see also All. For Hippocratic Med.*, 602 U.S. at 379 (explaining that standing helps ensure that federal courts do not "operate as an open forum for citizens 'to press general complaints about the way in which government goes about its business'" (quoting *Allen*, 468 U.S. at 760)); *Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 77–78 (2d Cir. 2022) (holding that plaintiffs who claimed disability discrimination had "failed to establish a 'real and immediate threat of [] injury'" and therefore lacked standing, where they did not sufficiently allege facts establishing a likelihood that they would patronize the defendant's establishment (citation omitted)). Again, because Plaintiff cannot show that enforcement of Local Law 20 is "sufficiently imminent," or that there is a "substantial risk that harm will occur," it lacks standing in this matter.

In sum, Plaintiff's assertions regarding the threat of future enforcement and potential prosecution amounts to speculation about a series of improbable events all occurring. But, as discussed, the evidence demonstrates that none of these events, no less all of them (as would be necessary), are likely to occur.[29] Plaintiff cannot establish Article III standing based on conjecture

---

[29] Indeed, the remote and speculative nature of Evergreen both violating and being sued under Local Law 20 is underscored by the fact that reported violations of Local Law 20's protections in the employment context are extremely rare, if not hypothetical. (*See* Def.'s 56.1 Resp. ¶ 26 (citing City Council Hearing Tr., Dkt. 40-2, at 18:09–22:11 (attesting to few instances of conduct to be prohibited by Local Law 20)); *see also id.* ¶ 33 (the City admitting that there have been no complaints under Local Law 20 since its passage).) "Although courts are generally willing to presume that the government will enforce the law as long as the relevant statute is recent and not moribund, the mere existence of a law prohibiting intended conduct does not automatically confer Article III standing." *Adam v. Barr*, 792 F. App'x 20, 22 (2d Cir. 2019) (summary order) (citations omitted). Instead, courts look to "the past or present enforcement of the [relevant law]," including whether Plaintiff "claim[s] that the [law] has been enforced against [it] in the past []or [whether Plaintiff] has ever been threatened with prosecution." *Id.* at 22–23. Here, there is no evidence that any enforcement action or private lawsuit has been brought against Evergreen for allegedly violating Local Law 20 as to any employee or applicant. *See also Evergreen Ass'n*, 2025 WL 359074, at *6 (finding that Evergreen lacked standing to challenge the Boss Bill in part because the law "has not been enforced against any employer at all, let alone Plaintiff"). By

alone.  *See Evergreen Ass'n*, 2025 WL 359074, at *4 ("Though Plaintiff has stated its intent to violate [the Boss Bill's] prohibition on taking adverse employment actions against its employees based on their reproductive health decisions, declarations of intent devoid of factual support are insufficient at this stage."); *see also, e.g.*, *Holder v. Humanitarian L. Project*, 561 U.S. 1, 25 (2010) ("Deciding whether [the plaintiffs' described] activities . . . would constitute prohibited [conduct] under the statute would require 'sheer speculation'—which means that plaintiffs cannot prevail in their pre[-]enforcement challenge."); *Lacewell v. Off. of Comptroller Currency*, 999 F.3d 130, 144 (2d Cir. 2021) (finding that plaintiff's "concern about preemption and its regulatory fallout is too speculative"); *see also Clapper*, 568 U.S. at 409 (noting that "allegations of *possible* future injury are not sufficient" to establish Article III standing (alteration omitted)); *Defs. of Wildlife*, 504 U.S. at 564 (explaining that "'some day' intentions—without any description of concrete plans, or indeed any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that [the caselaw] require[s]" (emphasis in original)).  Because Evergreen fails to raise a question of material fact as to whether the threat or risk of an enforcement action against it for violating Local Law 20 is sufficiently imminent, it cannot show that it has standing to bring a pre-enforcement challenge to Local Law 20.  This case therefore must be dismissed under Rule 12(b)(1).

---

contrast, in *New Hope Family Services*, which the Second Circuit found "resembled" *Slattery v. Hochul*, the plaintiff had been advised by New York State officials that the plaintiff's policy against recommending adoption by unmarried or same-sex couples violated a state regulation and that the plaintiff "either had to change its policy to conform to the regulation or close its adoption operation."  *New Hope Fam. Servs.*, 966 F.3d at 149.

### III.    This Case Is Unripe

#### A.    Legal Standard

In addition, this case must be dismissed for lack of ripeness.  "'Ripeness is a term that has been used to describe two overlapping threshold criteria for the exercise of a federal court's jurisdiction,' which address 'whether a case has been brought prematurely.'"  *Revitalizing Auto Cmtys. Env't Response Tr. v. Nat'l Grid USA*, 10 F.4th 87, 99 (2d Cir. 2021) (quoting *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 725 F.3d 65, 109–10 (2d Cir. 2013)).  The first criterion is constitutional ripeness, which "'originate[s]' from the same Article III limitation" as the standing doctrine.  *Susan B. Anthony List*, 573 U.S. at 157 n.5 (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006)); *see also Nat'l Grid USA*, 10 F.4th at 99.  "Prudential ripeness, in contrast to constitutional ripeness, 'constitutes an important exception to the usual rule that where jurisdiction exists a federal court must exercise it, and allows a court to determine that the case will be better decided later.'" [30]  *Nat'l Grid USA*, 10 F.4th at 100 (quoting *MTBE*, 725 F.3d at 110).

"In determining whether a claim is prudentially ripe, [courts] ask whether the claim is fit for judicial resolution and whether and to what extent the parties will endure hardship if decision is withheld."  *Id.* (quoting same).  The fitness consideration "prevents courts from declaring the

---

[30]  The Court recognizes that the ripeness doctrine is generally disfavored.  Today, constitutional ripeness concerns are often subsumed by the standing doctrine.  *See Susan B. Anthony List*, 573 U.S. at 157 n.5 ("[T]he Article III standing and ripeness issues in this case 'boil down to the same question.'" (quoting *MedImmune, Inc.*, 549 U.S. at 128 n.8)).  And as the Second Circuit has explained, "the Supreme Court has recently cast doubt on the reach of the prudential ripeness doctrine," explaining that "a federal court's ability to decline jurisdiction on prudential ripeness grounds must be reconciled with the 'virtually unflagging' obligation . . . 'to hear and decide cases within its jurisdiction.'"  *Nat'l Grid USA*, 10 F.4th at 102 (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125–26 (2014)); *see also id.* (explaining that the Supreme Court has "call[ed] into question 'the continuing vitality' of the prudential ripeness doctrine" (quoting *Susan B. Anthony List*, 573 U.S. at 167)).

meaning of the law in a vacuum and from constructing generalized legal rules unless the resolution of an actual dispute requires it." *Simmonds v. Immigr. & Naturalization Servs*., 326 F.3d 351, 357 (2d Cir. 2003). This "analysis 'is concerned with whether the issues sought to be adjudicated are contingent on future events or may never occur.'" *Id.* at 359 (quoting *Isaacs v. Bowen*, 865 F.2d 468, 478 (2d Cir. 1989)). "Conversely, issues have been deemed ripe when they would not benefit from any further factual development and when the court would be in no better position to adjudicate the issues in the future than it is now." *Id.* In assessing hardship, the second prudential ripeness consideration, courts "ask whether the challenged action creates a direct and immediate dilemma for the parties." *Marchi v. Bd. of Coop. Educ. Servs. of Albany*, 173 F.3d 469, 478 (2d Cir. 1999). "The mere possibility of future injury, unless it is the cause of some present detriment, does not constitute hardship." *Simmonds*, 326 F.3d at 360. "Prudential ripeness is . . . a tool that courts may use to enhance the accuracy of their decisions and to avoid becoming embroiled in adjudications that may later turn out to be unnecessary." *Id.* at 357. Together, these considerations prevent courts, "through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies." *N.Y. C.L. Union v. Grandeau*, 528 F.3d 122, 130–31 (2d Cir. 2008*)* (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977)).

### B.    Application

Both constitutional and prudential ripeness considerations weigh against this Court adjudicating this case. For substantially the same reasons that Evergreen does not have standing

to bring these claims—which the Court will not repeat here—constitutional ripeness is lacking. Therefore, there is no real case or controversy before the Court.[31]

Even if the Court were to find that it has jurisdiction over this case, prudential hardship considerations would counsel against this Court's exercise of jurisdiction. Since Evergreen has not shown that it is likely to violate Local Law 20 or that Local Law 20 is likely to be enforced against it, the Court "cannot conclude that [Evergreen] will suffer any significant hardship" if its request for relief is denied at this time. *Simmonds*, 326 F.3d at 361. Indeed, after the dismissal of this case, the most likely outcome is that the status quo will continue: Evergreen will carry on as it always has, and no enforcement action will be brought against it under Local Law 20.

## CONCLUSION

For the reasons explained above, Defendant's motion for summary judgment is granted and Plaintiff's motion for summary judgment is denied.[32] The Clerk of Court is directed to enter judgment and close this case.

SO ORDERED.

/s/ Pamela K. Chen
Pamela K. Chen
United States District Judge

Dated: February 6, 2025
Brooklyn, New York

---

[31] As here, courts often conclude that standing and constitutional ripeness rise and fall together. *See, e.g.*, *Grandeau*, 528 F.3d at 130 n.8 (collecting cases); *Susan B. Anthony List*, 573 U.S. at 167 (holding that ripeness factors were "easily satisfied" where petitioners had sufficiently alleged standing); *Lacewell*, 999 F.3d at 149 ("Accordingly, for substantially the same reasons set forth above with respect to Article III standing, we hold that DFS's APA claims are not constitutionally ripe.").

[32] If the Court were to reach the merits of this case, at minimum, it would grant the City's motion for summary judgment as to Evergreen's First Amendment free speech and free exercise of religion claims pursuant to *Slattery v. Hochul*, 61 F.4th at 292–94.